## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

NATHAN WADE,

                    Plaintiff,

        v.

AT&T INC. and AT&T MOBILITY
LLC,

                    Defendants.

**JURY TRIAL DEMANDED**

## COMPLAINT AND DEMAND FOR RELIEF

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION.................................................................1

II.   PARTIES........................................................................7

III.  JURISDICTION AND VENUE ..................................................8

IV.   BACKGROUND FACTS .......................................................9

A.    Nathan Wade is a non-consumer customer of FirstNet, an AT&T cellular network that promises to secure law enforcement data and serve public safety. ...........................9

1.    AT&T secured a government contract to offer FirstNet to law enforcement and first responders......................9

2.    AT&T promotes FirstNet's "unprecedented security" and promises subscribers it will protect their private data. ........................................11

3.    Mr. Wade joins FirstNet in 2023. ............................19

B.    AT&T provides the criminal defendants Mr. Wade is prosecuting with nearly 14,000 pages of Mr. Wade's sensitive location and phone data. .....................19

1.    Mr. Wade joins the Fulton County District Attorney's Office to investigate election interference. ...............................................19

2.    Criminal defendants' efforts to subpoena Mr. Wade's personal information are blocked by the Superior Court. ........................................24

3.    Unbeknownst to Mr. Wade, criminal defendants issue a secret subpoena seeking highly sensitive location and cell usage data from AT&T. ...............28

4.    AT&T produces nearly 14,000 pages of Special Assistant District Attorney Wade's sensitive information to criminal defendants..........................32

C.    Contrary to AT&T's public representations, it did not protect Mr. Wade's personal cell phone information or privacy...................................................................36

    1.    AT&T failed to provide adequate notice. ..................................37

    2.    AT&T's review of the Roman AT&T Subpoena was grossly negligent.................................................40

    3.    AT&T failed to require any evidence of probable cause before releasing 12 months of highly sensitive location data.................................................47

D.    AT&T's conduct violates federal law designed to protect sensitive consumer cell information. ....................................49

E.    AT&T's unlawful disclosure of Mr. Wade's private cell phone data caused significant harm. ....................................53

    1.    Mr. Wade has suffered significant harm as a result of AT&T's disregard for his safety and privacy.....................53

    2.    AT&T's violation of prosecutorial privacy is a serious breach of public safety, with detrimental consequences. .................................................58

V.    CAUSES OF ACTION .........................................................61

COUNT I: The Federal Communications Act (47 U.S.C. § 201 *et seq.*)................................................................61

COUNT II: Intrusion Upon Seclusion ........................................63

COUNT III: Public Disclosure of Private Facts ............................65

COUNT IV: Negligence .......................................................67

COUNT V: Attorneys' Fees & Costs under O.C.G.A. § 13-6-11 ...............70

COUNT VI: Punitive Damages ..................................................71

The plaintiff, Nathan Wade, for his complaint against defendants AT&T Inc. and AT&T Mobility LLC (collectively "AT&T"), alleges the following based on (a) personal knowledge, (b) the investigation of counsel, and (c) information and belief.

## I.    INTRODUCTION

1.    AT&T violated Nathan Wade's privacy and jeopardized both his wellbeing and public safety when it unlawfully released his sensitive cell phone information, including more than a year of precise location data and call and text records, to the criminal defendants he was prosecuting on behalf of the State of Georgia. AT&T's reckless disregard for Mr. Wade's safety, and its violation of both the law and its own promises to its users, has robbed Mr. Wade of his privacy and led to years of harassment and mental anguish.

2.    Nathan Wade is an attorney who has served the State of Georgia in myriad roles for more than 25 years, including as a prosecutor, a judge, a non-profit board member, and an engaged community member. When asked by the Fulton County's District Attorney's Office in 2021 to lead an unprecedented investigation into and criminal prosecution of efforts to overturn the State's lawful 2020 presidential election, Mr. Wade did what he had done for decades: he stepped up. He agreed to put aside his successful private law practice and his work as a

judge to be the public face and the legal engine behind the State's prosecution, which concerned some of the most famous politicians in the country.

3.     Mr. Wade expected his work as a Special Assistant District Attorney to be demanding and highly scrutinized: it involved historic claims against a former president and was the subject of nationwide media coverage. What Mr. Wade did not, and could not, expect was that in the midst of his prosecution of 19 criminal defendants, his cell phone provider—AT&T—would produce to those defendants and their lawyers nearly 14,000 pages of Mr. Wade's cell phone data, providing them a vast and intimate window into Mr. Wade's personal life without his knowledge or consent.

4.     Less than three days after it received a secret subpoena issued by a personal investigator hired by Mr. Trump, AT&T produced 12 months of Mr. Wade's location data and call and text records to counsel for the criminal defendants Mr. Wade was prosecuting on behalf of the State. The details in these records were breathtaking: they showed every call Mr. Wade made or received, every text message he sent or received, and his precise location during each and every one of those contacts. They revealed where Mr. Wade lived, where he received medical care or attended religious services, and his daily routines. They exposed the phone numbers of his children and his associates. They allowed the criminal defendants that Mr. Wade had agreed to prosecute on behalf of the State

to ascertain nearly every detail about his personal life—and many confidential details about the ongoing prosecution. Indeed, the Supreme Court has described these types of cell phone location records as "hold[ing] for many Americans the 'privacies of life.'"[1]

5.    AT&T produced these records without providing Mr. Wade any actual notice or opportunity to object, sending only an unsigned "Dear Valued AT&T Customer" letter by email telling him he had fewer than 24 hours to seek court intervention before his phone records would be produced to the targets of his criminal investigation. Not surprisingly, the letter ended up in Mr. Wade's spam folder. AT&T made no further efforts, such as calling Mr. Wade's wireless number (which AT&T itself provided service for) to contact Mr. Wade, leaving him completely unaware of the impending privacy breach.

6.    Less than 24 hours after emailing Mr. Wade, AT&T produced five extensive reports spanning nearly 14,000 pages and detailing all of Mr. Wade's calls, texts, and movements over the course of 12 months to the lawyers for the criminal defendants Mr. Wade was prosecuting. AT&T made the production without redacting *any* of Mr. Wade's or his associates' personal information or taking any steps to prevent their broad dissemination or public use. Shortly thereafter, the records were leaked to the media and quickly circulated on social

---

[1] *Carpenter v. United States*, 585 U.S. 296, 297 (2018) (citation modified).

media, publicly revealing Mr. Wade's personal contact information and home address and setting off an avalanche of violent and racist threats to Mr. Wade's safety that continue to this day.

7.     AT&T's breach of Mr. Wade's privacy violated federal law (the Federal Communications Act), which requires AT&T to safeguard user data and is designed to prevent exactly this type of dangerous breach. AT&T's conduct also violated Georgia state law, including the constitutional right to privacy and the privacy laws prohibiting the intrusion upon Mr. Wade's seclusion and the public disclosure of private facts found in his cell phone data. AT&T's egregious failure to take even basic steps to protect Mr. Wade also constitutes gross negligence under Georgia law.

8.     AT&T not only broke the law, it also breached its own affirmative promises to users like Mr. Wade. Entrusted with running a cellular network established by the federal government and dedicated to public servants and law enforcement personnel like Mr. Wade called FirstNet, AT&T has for years promised that its security measures were unprecedented and that public safety was its top priority. AT&T details the specific steps it will take in response to subpoenas like the one issued here: promising to make sure they are valid, provide consumers transparency and choice, and produce highly sensitive records like

4

location data only if presented with evidence of probable cause through a search warrant or a court order.

9.      AT&T broke every one of these promises. Rather than protect public servants, it disregarded every protocol in place to guard their privacy. Despite promising to investigate every subpoena it received using a team of trained specialists, AT&T failed to conduct even a minimal amount of diligence, which would have shown the highly irregular nature of the secret subpoena: a subpoena to testify in a criminal case and bring sweeping swaths of documents concerning the personal and professional contacts and movements of the lead prosecutor. AT&T knew the subpoena was for a criminal case. It knew that Mr. Wade wasn't the defendant in that case. It knew Mr. Wade was a prosecutor. It knew that the subpoena requested 12 months of location data but was not supported by *any* explanation for why, let alone a court order or a search warrant establishing the probable cause that AT&T says it requires. AT&T nonetheless produced Mr. Wade's location and call logs without objection and provided no actual notice, consent, or opportunity to object.

10.      The consequences were immediate and severe. Hate mail laced with explicit and racist threats filled Mr. Wade's mailbox. Strangers congregated outside his home at all hours, requiring law enforcement to take up shifts outside just so Mr. Wade could get a few hours of sleep. Mr. Wade's peace and safety in

his own home disappeared overnight. He warned his children that they could not safely come see him in Atlanta, where they were raised.

11.    AT&T's breach not only revealed the details of Mr. Wade's personal life, it also exposed many of the confidential and highly sensitive details of the State's investigations, undermining the integrity of the ongoing prosecution. Mr. Wade's call, text, and location records revealed the identity of fact witnesses who spoke with Mr. Wade, the State's lead prosecutor. By producing those records to the criminal targets of that investigation without providing any notice to Mr. Wade or the District Attorney's Office, AT&T undermined the critical work underway on behalf of the State.

12.    AT&T's violations of federal and state privacy laws and its breach of its own promises to protect the privacy of its users threatens not only the safety of public servants like Mr. Wade, but if allowed to stand, the willingness of others like him to serve the public for fear of their own safety. What reasonable public servant would agree to prosecute, for example, violent criminal gangs, if they knew that their highly sensitive personal cell phone data could be produced, without notice or consent, to those defendants and their lawyers, compromising their safety and security?

13.    Mr. Wade brings this lawsuit to hold AT&T accountable for its egregious failings.

## II.    PARTIES

14.    The plaintiff, Nathan Wade, is a natural person and citizen of Fulton County, Georgia.

15.    Defendant AT&T Inc. is a publicly traded corporation organized and existing under the laws of the State of Delaware, maintaining its principal place of business at 208 S. Akard Street, Dallas, Texas 75202. AT&T Inc. transacts or has transacted business in this District and throughout the United States. It is the second largest wireless carrier in the United States.

16.    Defendant AT&T Inc. provides mobile wireless telecommunication services—including FirstNet telecommunication services—and sells mobile wireless handsets to Georgians, including the plaintiff, through AT&T Inc. and its wholly owned subsidiaries, including Defendant AT&T Mobility LLC. By registering to do business in Georgia and appointing an agent for service of process in Georgia, AT&T Inc. has consented to general personal jurisdiction in this State.

17.    AT&T Mobility LLC (also known as AT&T Wireless) is a Delaware limited liability corporation with its principal office or place of business at 1025 Lenox Park Blvd NE, Atlanta, Georgia. AT&T Mobility provides wireless service to subscribers in the United States, including in this district. AT&T's Mobility business unit provides nationwide wireless services to consumers and wholesale and resale wireless subscribers located in the United States, including in this

district. By registering to do business in Georgia and appointing an agent for service of process in Georgia, AT&T Mobility LLC has consented to general personal jurisdiction in this State.

18.    Defendants AT&T Inc. and AT&T Mobility LLC are referred to herein as "AT&T."

19.    AT&T operates FirstNet, which it describes as "America's first and only purpose-built public safety network." FirstNet has more than 6 million connections across more than 28,000 U.S. agencies and organizations.[2]

20.    AT&T is a "common carrier" governed by the Federal Communications Act ("FCA"), 47 U.S.C. § 151 *et seq.* AT&T is regulated by the Federal Communications Commission ("FCC") for its acts and practices, including those occurring in this District.

### III.    JURISDICTION AND VENUE

21.    This Court has original jurisdiction over this matter under 28 U.S.C. § 1331 because this case is a civil action that asserts claims under the Constitution, laws, or treaties of the United States. In particular, Mr. Wade asserts claims under The Federal Communications Act, 47 U.S.C. § 201, *et seq.*

---

[2] "Our Purpose," AT&T, available at https://about.att.com/pages/corporate-profile.

22.    Venue is proper in the Northern District of Georgia in accordance with 28 U.S.C. § 1391(b)(2) because this district is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

## IV.    BACKGROUND FACTS

**A.    Nathan Wade is a non-consumer customer of FirstNet, an AT&T cellular network that promises to secure law enforcement data and serve public safety.**

23.    This case concerns the unlawful disclosure of Special District Attorney Nathan Wade's personal information (including precise location data and call and text records) by his wireless provider, AT&T.

24.    At the time of the disclosure, Mr. Wade was a subscriber of FirstNet, an AT&T cellular network designed for law enforcement officials and offered as a private-public partnership between AT&T and the federal government.

**1.    AT&T secured a government contract to offer FirstNet to law enforcement and first responders.**

25.    Congress established the First Responder Network Authority as a part of the Middle Class Tax Relief and Job Creation Act of 2012.[3] The First Responder Network Authority is an independent agency within the National Telecommunication and Information Administration, which is itself a component of the United States Department of Commerce.

---

[3] Pub. L. No. 112-96 (Act) (47 U.S.C. §§ 1421, *et seq*.).

26.     The First Responder Network Authority was created to address fundamental problems with the communication systems used by first responders which were identified in connection with their heroic response to the September 11, 2001 terrorist attacks.[4] Specifically, law enforcement and first responders found that because they relied on the same wireless networks as the public, they too faced congested networks and an inability to communicate in emergencies.

27.     The First Responder Network Authority is responsible for ensuring "the building, deployment, and operation of the nationwide public safety broadband network" for first responders.[5] In that role, it is empowered by Congress to contract with private companies like AT&T.[6]

28.     On March 30, 2017, the First Responder Network Authority announced "the selection of AT&T to build the FirstNet network, a nationwide wireless broadband network dedicated to America's first responders."[7]

29.     After AT&T was selected as the provider of FirstNet, state governors had 90 days to decide whether to opt their state into the FirstNet buildout plan.

---

[4] FirstNet, "FirstNet: The History of our Nation's Public Safety Network," *available at* https://firstnet.gov/about/history.

[5] 47 U.S.C. § 1426(b)(1).

[6] 47 U.S.C. § 1426(a)(3), (b)(1)(B) and (D), (b)(4)(A).

[7] FirstNet, "FirstNet partners with AT&T to build wireless broadband network for America's first responders," *available at* https://firstnet.gov/newsroom/media-kit/partnership.

Ultimately, all 50 states, two U.S. territories, and Washington, D.C. joined the FirstNet program.

30.    In November 2017, Georgia's then-governor, Nathan Deal, accepted the First Responder Network Authority and AT&T's plan to deliver a wireless broadband network to the state's public safety community, with the network lauded at the time as bringing "advanced technologies that will help Georgia's first responders save lives and protect communities."[8] As a result of Georgia's decision to opt-in, AT&T agreed to "build, operate and maintain a highly secure wireless broadband communications network for Georgia's public safety community at no cost to the state."[9]

### 2.    AT&T promotes FirstNet's "unprecedented security" and promises subscribers it will protect their private data.

31.    Since AT&T was selected to provide the FirstNet service, the company has routinely touted its commitment to serving public safety and protecting law enforcement officials like Mr. Wade, including by advertising heightened data security for FirstNet users.

32.    AT&T makes FirstNet available to "first responders around the country at all levels of government and local organizations and other public safety

---

[8] FirstNet, "Georgia to Transform Communications for Public Safety; Governor Deal Approves Buildout Plan for First Responder Network" (Nov. 17, 2017), *available at* https://web.archive.org/web/20201102034711/https://2014-2018.firstnet.gov/news/georgia-transform-communications-public-safety.

[9] *Id.*

11

entities who answer the call when emergencies arise."[10] Only qualifying public

servants can participate in FirstNet, including persons working in law enforcement

(such as Mr. Wade), 9-1-1 dispatch, military emergency response, government

emergency management, or EMS and fire services.

33.    AT&T has repeatedly stressed (and advertised) the purported public

safety and security benefits of its FirstNet program.

34.    When the partnership was first announced in 2017, AT&T described

the "public-private infrastructure investment" as a "much needed investment in

America's communications infrastructure to support millions of first responders

and public safety personnel nationwide who protect and serve more than 320

million people across the U.S."[11] Its chairman and CEO stressed the role FirstNet

would play in making "public safety a national priority." The company framed

FirstNet as a "public safety mission."[12]

35.    AT&T continues to stress the network's purported prioritization of

public safety as one of its core components and a major selling point for the

---

[10] AT&T, "FirstNet Privacy Policy" (July 1, 2024), *available at*
https://www.firstnet.com/privacy-notice.html.

[11] AT&T Inc., "AT&T Selected by FirstNet to Build and Manage America's
First Nationwide Public Safety Broadband Network Dedicated to First
Responders," PR Newswire (Mar. 30, 2017), *available at*
https://www.prnewswire.com/news-releases/att-selected-by-firstnet-to-build-and-
manage-americas-first-nationwide-public-safety-broadband-network-dedicated-to-
first-responders-300431897.html.

[12] *Id.*

service. For example, in July 2025, Scott Agent—an AT&T employee who serves as the president of FirstNet[13]—lauded FirstNet's role in "supporting public safety" and stressed that the company would be there for FirstNet subscribers, like Mr. Wade, "for as long as they need us."[14]

36.     On its web page dedicated to the public sector, AT&T describes the FirstNet network as built and run by AT&T and says it "is *the* nationwide, wireless communications platform dedicated to America's first responders and public safety community. And with FirstNet, we make public safety's mission the priority."[15]

37.     Likewise, in announcing that Georgia would join FirstNet and make it available to qualifying public servants, AT&T's Bill Leahy stated that "AT&T is proud to work with Governor Deal to bring this dedicated, interoperable public safety broadband network to Georgia, and connect its public safety community to advanced technologies that will help save lives."[16]

---

[13] "AT&T Names Scott Agnew New President of FirstNet," Washington Exec (Aug. 26, 2024), *available at* https://washingtonexec.com/2024/08/att-names-scott-agnew-new-president-of-firstnet/.

[14] Scott Agnew, "How FirstNet Helps Public Safety During Big, Complex Moments," AT&T (July 16, 2025), *available at* https://www.attconnects.com/how-firstnet-helps-public-safety-during-big-complex-moments/.

[15] AT&T, FirstNet, "Built with AT&T," *available at* https://about.att.com/pages/public-sector (emphasis in original).

[16] FirstNet, "Georgia to Transform Communications for Public Safety; Governor Deal Approves Buildout Plan for First Responder Network" (Nov. 17, 2017), *available at* https://web.archive.org/web/20201102034711/https://2014-2018.firstnet.gov/news/georgia-transform-communications-public-safety.

38.     In promoting its FirstNet service, AT&T continuously emphasizes data security among other attributes. For example, in touting the benefits of FirstNet, AT&T tells subscribers it will keep their "critical data secure":[17]



39.     Similarly, AT&T tells subscribers like Mr. Wade that its "commitment to you," includes "giving first responders and emergency personnel the superior reliability you need to complete your mission."[18] AT&T stresses that FirstNet is the right choice for public servants because it "is built specifically for public safety, offering unmatched reliability, *security and accountability*"[19] and advertises that it is superior to commercial cell phone providers due to its "dedicated fleet of deployable assets *and security that goes well beyond standard commercial network security measures*…."[20]

---

[17] FirstNet, "Why FirstNet," *available at* https://www.firstnet.com/why-firstnet.html.

[18] *Id.*

[19] *Id.*

[20] *Id.*

40.    Elsewhere on its website, AT&T describes FirstNet as a "reliable, *highly secure* communications platform"[21] with AT&T touting its "*unprecedented security*."[22] In advertising concerning FirstNet's rate plan features, AT&T promotes the program's "*unmatched security*" and claims the network is "[d]esigned with a *robust security strategy and monitored by a dedicated Security Operations Center*" that "goes well beyond standard commercial network security measures *to keep your sensitive data secure*."[23]

41.    AT&T made an intentional marketing decision to focus on public safety and security. According to the Congressional Research Service, AT&T faced a financial challenge "in enrolling subscribers to the system" as "FirstNet/AT&T must offer better coverage, services, and features than they currently have, at a price public safety agencies can afford, if they want to attract users to the network."[24] As a result, AT&T's early deployment of the FirstNet network faced challenges as "[s]ome public safety agencies have expressed

---

[21] FirstNet, "Frequently Asked Questions," *available at* https://www.firstnet.com/faq.html.

[22] *Id.* (emphasis added).

[23] FirstNet, "Individual Plan: FirstNet and Family," *available at* https://www.firstnet.com/plans.html#individual-plans (emphasis added).

[24] Library of Congress, *The First Responder Network (FirstNet) and Next-Generation Communications for Public Safety: Issues for Congress* (April 27, 2018), *available at* https://www.congress.gov/crs_external_products/R/PDF/R45179/R45179.6.pdf (emphasis added).

reluctance to join the FirstNet network, citing uncertainties with the resiliency, reliability, *and security* of the network, coverage, and cost."[25]

42.    In response, as detailed above, AT&T has repeatedly touted its alleged superior commitment to public safety and law enforcement officials' security.

43.    AT&T reiterates many of these commitments to safety and privacy in its privacy policy, wherein it is clear that the FirstNet service is provided by AT&T but that a subscriber like Mr. Wade is "considered a *non-consumer* customer of AT&T."[26]

44.    AT&T discloses that FirstNet subscribers are subject to AT&T's privacy policy, aside from specified differences in the separate FirstNet Privacy Policy.[27] For its part, the AT&T Privacy Policy makes specific representations about how cellular data is collected, used, and disclosed.[28]

45.    As relevant here, AT&T discloses that it might release personal information (which it defines to include location data) to "[c]omply with court orders, subpoenas, and lawful discovery requests, and as otherwise authorized or required by law."[29] The AT&T Privacy Policy then directs readers to its

---

[25] *Id.* (emphasis added).

[26] AT&T, "FirstNet Privacy Policy" (July 1, 2024), *available at* https://www.firstnet.com/privacy-notice.html .

[27] *Id.*

[28] The AT&T Privacy Policy cited herein is the policy in force at the time of the unlawful conduct. *See* Ex. A (AT&T December 2023 Privacy Policy).

[29] *Id*.

"Transparency Report" for more details about when and how such information is disclosed.[30]

46.    The Transparency Report, in turn, details AT&T's process for responding to subpoenas. In its 2023 report (the last Transparency Report issued by AT&T before the misconduct alleged here), AT&T assures users that "[b]efore we respond to **any** legal demand, we determine that we have received the correct type of demand based on the applicable law for the type of information sought."[31]

47.    AT&T also represents that it "require[s] a search warrant *based on the probable cause standard for all demands for real-time or historical location information*, except in emergency situations."[32] It describes probable cause as "the highest standard to demand evidence" and states that warrants or orders establishing probable cause "must be supported by sworn testimony and sufficient evidence to *believe the information demanded is evidence of a crime*."[33]

48.    The 2023 Transparency Report is clear that AT&T bears "responsibility to protect [users'] information and privacy" and represents that it takes that responsibility "very seriously."[34]

---

[30] AT&T states that at used in this report, "'AT&T' includes *all of AT&T's operating units*." AT&T, "Transparency Report" *available at* https://sustainability.att.com/reports/transparency-report (emphasis added).

[31] Ex. B (AT&T 2023 Transparency Report) at 5 (emphasis in original).

[32] *Id.* at 7 (emphasis added).

[33] *Id.* at 6 (emphasis added).

[34] *Id.* at 2.

49.     In a Customer Privacy Issue Brief linked at the 2023 Transparency Report, AT&T recognizes that "consumers expect companies to safeguard their personal data and manage it responsibly" and represents that "[a]t AT&T, we have a *fundamental commitment to safeguard consumer* and employee *personal data while offering meaningful choice and transparency*. We maintain our commitment through our principles of transparency, security, choice and control, and integrity."[35] AT&T defines those principles as follows:[36]

- **Transparency:** We're open and honest about how we use your data.
- **Security:** We use strong safeguards to keep your data confidential and secure.
- **Choice and control:** We give you choices about how we use your data.
- **Integrity:** We do what we say.

50.     In summary, at all times relevant, AT&T not only knew that it was offering services to law enforcement officials like Mr. Wade who faced unique security risks, but also specifically touted to that population FirstNet's commitment to public safety and its "*unprecedented security*" as selling points for enrollment.

51.     At the time of the conduct alleged herein, AT&T explicitly recognized that it bore responsibility for protecting the sensitive data of public servants like

---

[35] AT&T, "Privacy" (as of Dec. 10, 2023), *available at* https://web.archive.org/web/20231210044119/https://sustainability.att.com/priority-topics/privacy.

[36] *Id.*

Mr. Wade and not only used that role in its FirstNet marketing efforts, but also made specific representations about the exact process it would use to safeguard users' highly sensitive data and thereby protect both FirstNet users and the public. AT&T failed to live up to these promises.

> **3.    Mr. Wade joins FirstNet in 2023.**

52.    As detailed below, Nathan Wade began working with the Fulton County District Attorney's Office in November 2021.

53.    Mr. Wade learned of the FirstNet program during a meeting with colleagues in the District Attorney's Office.

54.    No later than April 2023, Mr. Wade went in-person to an AT&T retail store in Cobb County, Georgia, to enroll in the program. During the visit, AT&T confirmed his position as a prosecutor and thus his eligibility to enroll, and Mr. Wade transferred his cellular service to FirstNet.

55.    Mr. Wade remained a FirstNet subscriber until he left the District Attorney's Office in 2024.

**B.    AT&T provides the criminal defendants Mr. Wade is prosecuting with nearly 14,000 pages of Mr. Wade's sensitive location and phone data.**

> **1.    Mr. Wade joins the Fulton County District Attorney's Office to investigate election interference.**

56.    Nathan Wade is an attorney who has been working in the Atlanta metropolitan area for more than 25 years. He received his law degree from John Marshall Law School and has served the public ever since, including as an

Assistant Solicitor General in Cobb County prosecuting misdemeanors and traffic citations, as Marietta's first black male judge serving as an Associate Municipal Court Judge, and as a Pro Hac Judge presiding in Cobb County State Court. In 2020, the Cobb County Sheriff's Office retained Mr. Wade to investigate claims of civil rights and constitutional violations in the county jail. Mr. Wade is also deeply involved in the Atlanta community, having served as a board member to both Cobb County Parks and Recreation and Communities in Schools of Marietta/Cobb County Inc., as well as coaching youth basketball and mock trial.

57.    In 2021, Mr. Wade was working as a private attorney at his law firm and an Associate Municipal Court Judge in Marietta when he was asked by the recently elected Fulton County District Attorney, Fani Willis, to assist with her office's investigation into interference in the 2020 Georgia presidential election.

58.    Mr. Wade had met Ms. Willis at a training conference for municipal court judges in 2019, where Mr. Wade was leading training sessions. When Ms. Willis was elected District Attorney in November 2020, Ms. Willis asked Mr. Wade to join her transition team.

59.    Shortly thereafter, the District Attorney's Office began investigating allegations of interference in the State's 2020 presidential election. Ms. Willis sought to appoint a full-time, special assistant prosecutor to oversee the investigation (and, if applicable, prosecution) of persons involved in alleged

criminal violations of Georgia law. In public interviews around that time, she cited the sprawling nature of the work and the already full docket of the District Attorney's Office as motivating her decision to hire a special prosecutor to lead this unprecedented effort.[37]

60.    At Ms. Willis's request, Mr. Wade assisted in identifying and interviewing candidates for the special assistant district attorney position. Many candidates, including former Georgia Governor Roy Barnes, refused to take on the role, citing safety concerns. In a hearing in Superior Court, Governor Barnes testified that he met with District Attorney Willis and Mr. Wade about the special prosecutor position and turned it down. Specifically, he testified that not long before that interview, the FBI reported to him that an individual involved with local militias had been making threats against his safety. Governor Barnes recalled requiring bodyguards while he served the State as governor and felt that, should he take on the job, he would need bodyguards "for the rest of his life."[38]

61.    To address these concerns and help protect the entire election interference team, the District Attorney's Office tasked a team of employees to

---

[37] D. Hakim & R. Fausset, "In Georgia, a New District Attorney Starts Circling Trump and His Allies," New York Times (Feb. 13, 2021), *available at* https://www.nytimes.com/2021/02/13/us/politics/fani-willis-trump.html.

[38] "Former GA Gov. Roy Barnes shares why he turned down Fani Willis' special prosecutor offer," Atlanta News First (Feb. 20, 2024), *available at* https://www.atlantanewsfirst.com/video/2024/02/20/former-ga-gov-roy-barnes-shares-why-he-turned-down-fani-willis-special-prosecutor-offer/.

monitor what private details about them—including their home addresses and phone numbers—were available online and to remove them where possible.

62.    In May 2021, at the appointment of District Attorney Willis, Mr. Wade began work as the Special Assistant District Attorney to represent the State of Georgia in its criminal investigation (and subsequent prosecution) of former President Donald J. Trump and 18 co-defendants for their alleged interference in the 2020 presidential election. Despite the role's risks and the public scrutiny, Mr. Wade accepted the job when asked because he recognized the deep importance of the issue at hand.

63.    The job immediately became a full-time undertaking that required Mr. Wade to step away from leading his private law firm. Over the course of the investigation into unlawful election interference, Mr. Wade examined the sprawling and complicated conduct at issue, traveling around the country to question witnesses, issue and negotiate subpoenas, and review reams of documents and various forms of digital and physical media. His work helped shape the architecture of the State's complicated, high-stakes, and unprecedent criminal case.

64.    In January 2022, the Chief Judge of the Superior Court of Fulton County, the Honorable Chriostopher S. Brasher, entered an order permitting the impaneling of a Special Purpose Grand Jury. The Grand Jury consisted of 26 Fulton County residents (including three alternates) impaneled to investigate "the

facts and circumstances relating directly or indirectly to possible attempts to disrupt the lawful administration of the 2020 presidential elections in the state of Georgia."[39]

65.    The members of the Special Purpose Grand Jury were selected on May 2, 2022 and began to hear evidence on June 1.[40] For more than six months, Mr. Wade presented information to the panel, including by questioning witnesses and issuing subpoenas for testimony and documents. The Special Purpose Grand Jury heard "extensive testimony on the subject of alleged election fraud from poll workers, investigators, technical experts, and State of Georgie employees and officials, as well as from persons still claiming that such fraud took place."[41]

66.    The intense investigation, led by Mr. Wade, culminated in the Special Purpose Grand Jury's December 15, 2022 recommendation that the District Attorney bring charges against more than a score of individuals related to the 2020 presidential election.[42] In their Report, the Special Purpose Grand Jury specifically

---

[39] Order Entering Special Purpose Grand Jury's Final Report into Court Record, Case No. 2022-EX-000024 (Sep. 8, 2023 Fulton Cnty. Sup. Ct.), Ex. A at 1, *available at* https://d3i6fh83elv35t.cloudfront.net/static/2023/09/2022-ex-000024-ex-parte-order-of-the-judge-2.pdf.

[40] *Id.*

[41] *Id.*

[42] *Id.* at 2-8.

acknowledged and thanked the "hardworking attorneys and staff of the Fulton County District Attorney's office."[43]

67.    On August 14, 2023, a separate grand jury indicted 19 defendants via a 41-count indictment, including then-former President Trump, former New York City Mayor Rudy Guiliani, and Director of Election Day Operations for the 2020 Trump Campaign Michael Roman.

### 2.    Criminal defendants' efforts to subpoena Mr. Wade's personal information are blocked by the Superior Court.

68.    After the grand jury indictment, Mr. Wade remained in his role as Special Assistant District Attorney leading the prosecution of the criminal defendants.

69.    On January 8, 2024, one of the defendants—Michael Roman, the director of election day operations for Donald Trump's 2020 presidential campaign—moved to disqualify the District Attorney, her office, and Special Assistant District Attorney Wade from the case. Defendant Roman argued that a conflict of interest prevented District Attorney Willis and Mr. Wade from pursuing the prosecution. Other defendants, including then-former President Trump, joined

---

[43] *Id.* at 8.

in Roman's motion. The Court set an evidentiary hearing on the motion for February 15, 2024.[44]

70.    On January 31, 2024, Defendant Roman's counsel filed a Return of Subpoenas and Witness List. The filing provided "notice that all individuals listed on the attached subpoenas are witnesses [Roman] intends to call at [the disqualification] hearing on February 15, 2024."[45] The filing included witness subpoenas for 12 individuals, including 9 employees of the District Attorney's Office.[46] In motions to quash, these witnesses argued that Roman had not even attempted to speak with them about information they might (or might not) have before serving his subpoenas and that the subpoenas were fishing expeditions meant to bully and harass each witness as well as the District Attorney's Office.

71.    On February 7, 2024, the District Attorney's Office timely moved to quash Defendant Roman's subpoenas and noted that Defendant Roman had also attempted to serve broad subpoenas on Mr. Wade's divorce attorneys (and former law partners) and on the bank Mr. Wade used for both his personal and law firm

---

[44] *See Georgia v. Roman*, No. 23SC188947, Notice of Motion Hearing (Jan. 18, 2024).

[45] *See Georgia v. Roman*, No. 23SC188947, Defendant Michael Roman's Return of Subpoenas and Witness List (Jan. 31, 2024).

[46] This included District Attorney Willis, Special Assistant District Attorney Wade, an executive district attorney, two deputy district attorneys, two assistant chief investigators, a deputy executive assistant, and the chief of investigation.

banking (Synovus Bank).[47] The Office filed another motion to quash on February 12, 2024, noting that by then Defendant Roman had served 12 subpoenas on District Attorney employees and 5 additional subpoenas on individuals affiliated with, but not employed by, the Office.[48] The DA's Office argued that none of the requested documents or testimony had any connection to the criminal charges against Defendant Roman and were instead intended to harass, oppress, and intimidate—including by "feeding the salacious tabloids."[49]

72.    Likewise, Mr. Wade personally moved to quash the subpoena asking a Synovus Bank witness to appear at the February 15 hearing and bring Mr. Wade's personal and law firm bank records under O.C.G.A. § 24-10-22(b)(1). Mr. Wade argued the subpoena was unreasonable, oppressive, and overly broad (it sought "any and all documents" associated with Mr. Wade and/or his firm and provided no dates or rationale for the requests). Mr. Wade only learned of the subpoena from the bank when it (unlike AT&T) provided Mr. Wade with actual notice of the subpoena and objected to compliance.[50]

---

[47] *See Georgia v. Roman*, No. 23SC188947, State's Mot. to Quash Subpoenas of Defendant Michael Roman (Feb. 7, 2024).

[48] *See Georgia v. Roman*, No. 23SC188947, Fulton County District Attorney's Office Mot. to Quash Subpoena (Feb. 12, 2024) at 1.

[49] *Id*. at 2-4.

[50] *See Georgia v. Roman*, No. 23SC188947, Special Prosecutor Nathan Wade's Mot. to Quash Subpoena (Feb. 8, 2024).

73.     Further, Mr. Wade argued about the risks presented by subpoenas like this: "To allow a criminal defendant to access the bank records of the prosecuting attorney on a whim would invite endless mischief. It would inspire other criminal defendants to do the same. It would annihilate Wade's constitutional right to privacy as a nonparty and prosecuting attorney. And it would impede—not further—this case by encouraging Roman to use additional spurious tactics to harass, oppress, and intimidate Wade. It is not—and has never been—the law to allow criminal defendants to fish for material unrelated to their criminal charges in hopes that the mere appearance of impropriety could curry favor with a court."[51]

74.     There is no generalized right to discovery in Georgia criminal cases. As Mr. Wade argued in his motion to quash, subpoenas by criminal defendants for even far more narrowly defined and restricted personal information about prosecutors are rarely served and even more rarely granted.[52]

75.     On February 12, the Superior Court held a hearing on the pending motions to quash. At the hearing, following arguments from the State and Mr. Wade's counsel that the Synovus Bank subpoena was an improper and overly broad fishing expedition disfavored by law, Judge McAfee found that the subpoena went "too far" and granted the motion to quash. The next day, the Superior Court

---

[51] *Id.* at 8.

[52] *Id.* at 5-7.

entered a written order quashing the Synovus Bank subpoena.[53] The Superior Court

held the motions to quash many of the witness subpoenas in abeyance, pending the

outcome of other witness testimony at the February 15 evidentiary hearing.

### 3. Unbeknownst to Mr. Wade, criminal defendants issue a secret subpoena seeking highly sensitive location and cell usage data from AT&T.

76.    On February 12, 2024—the same day as the hearing on the motion to

quash the Roman subpoenas—and unbeknownst to the court, Mr. Wade, or the

District Attorney's Office, Defendant Roman's counsel (Ashleigh Merchant) faxed

a subpoena to AT&T through a private investigator (Charles Mittelstadt) retained

by Defendant Trump's counsel. The fax was received by AT&T at 11:27 AM ET

on February 12, 2024.[54]

77.    The Roman AT&T subpoena, like the Synovus Bank subpoena,

requested the appearance of an AT&T representative at the February 15, 2024

evidentiary hearing concerning Defendant Roman's motion to disqualify. It cited

O.C.G.A. § 24-13-23 and requested that the AT&T representative "bring with you

into said Court certain matters to be used as evidence by the Defendant in the case

of State v. Michael Roman, Case Number 23SC18894" and directed AT&T to an

---

[53] *See Georgia v. Roman*, No. 23SC188947, Order on Nathan Wade's Motion to Quash (Feb. 13, 2024).

[54] *See* Ex. C ("The Roman AT&T Subpoena").

"Attachment A." Attachment A requested sweeping amounts of Mr. Wade's

personal information falling within two categories:

> All records associated with the identified Cingular/AT&T
> mobile subscriber number (█████████), relating to all
> delivered and undelivered inbound and outbound calls, text
> messages, SMS, and MMS, from **January 1st, 2021** through
> **November 30th, 2021** and from **January 15th, 2024** through
> **February 16th, 2024**, to include date, time, direction, duration,
> number called or text to and/or received from, and cell-site and
> sector information related to each call, text.

> **AT&T Specialized Location Records**: All call, text and data
> connection location information, related to all specialized
> carrier records that may be referred to as NELOS (Network
> Event Location System) and/ or Historical GPS/Mobile Locate
> Information which shows GPS location (longitude and latitude)
> and Cell-Site and sector of the device in relationship to the
> network when connected to the network for the above
> referenced number.[55]

78.     The subpoena's scope is stunning: it requests *all of Mr. Wade's call

and text records* and *location data* associated with every single call or message. It

is not limited by geography nor by contacts with certain individuals, and it spans

*more than 12 months* of records (including 4 days into the future). The subpoena is

not accompanied by *any* support for its sweeping breadth; there is no search

warrant, court order, or indeed any description or support for the request of any

kind. Nor is it supported with *any* evidence of probable cause (nor could it be: Mr.

Wade was not accused of any criminal misconduct).

---

[55] *See* Ex. C (bold in original, redaction of Mr. Wade's private number added).

79.    The subpoena's footer shows that AT&T received the subpoena on February 12, 2024 at 11:27 a.m. EST—the very same day the Court held a hearing on (and quashed) the non-AT&T Roman subpoenas. Nonetheless, neither the State nor Mr. Wade received any notice that an additional subpoena had been served.

80.    On Wednesday, February 14, 2024, two days after receiving the subpoena, AT&T emailed an unsigned letter and a copy of the subpoena to Mr. Wade.[56] The 8:16 a.m. ET email informed Mr. Wade that AT&T had "received the enclosed civil subpoena" and that, "as a courtesy," it was sending "notice to your address on file to enable you to contest the subpoena if you wish to do so."[57] AT&T also stated its plan "to respond to this subpoena on Thursday, February 15"— *the very next day*—unless Mr. Wade filed a motion to quash before then— i.e., *that same day*. [58]

81.    Mr. Wade did not receive AT&T's "notice" email: it was designated spam because it included a zip file containing two attachments and came from an address from which Mr. Wade had never received any emails. Despite its access to his cell phone number (as his cell phone provider) and his address (which is

---

[56] *See* Ex. D.

[57] *Id.*

[58] *Id.* (informing Mr. Wade that "[a] motion to quash will be necessary to prevent the records from being released").

included in the February 14, 2024 letter), AT&T took *no additional steps* to reach Mr. Wade to provide notice or confirm he had received notice of the subpoena.

82.     Had Mr. Wade been aware of the subpoena—if, for example, his cell phone provider called or messaged him to inform him—he would have opposed it on the same grounds that he successfully opposed the subpoena to Synovus Bank: it was an improper, overbroad fishing expedition for his personal information, irrelevant to the substance of the criminal charges at issue, and was being used to bully and harass Mr. Wade and distract from the allegations against Defendant Roman and his co-conspirators. Likewise, Mr. Wade would have cited the same law successfully invoked to quash the Synovus Bank subpoena: this kind of discovery of a prosecutor's personal information is disfavored, only allowed in extreme situations not present here and, if allowed, would encourage criminal defendants to use discovery (to which there is no generalized right in criminal cases) to harass and intimidate prosecutors and undermine public safety.[59]

83.     Such a motion to quash would have almost certainly been granted. Trial subpoenas like the Roman AT&T subpoena may compel the witness to attend a trial or hearing and, if requested, to bring *specific* documents or tangible evidence with them.[60] But a trial or hearing subpoena is not "an instrument of discovery."

---

[59] *See* Feb. 8, 2024 Wade Mot. to Quash.
[60] *See* O.C.G.A. § 24-13-21.

When a trial or hearing subpoena requests the production of documents under § 24-13-23(a), the subpoena must specify the specific item of evidence for introduction at trial. Thus, proper trial subpoenas seek limited information such as the results of a gas chromatograph test or a sheriff's investigative file.

84.    By contrast, a subpoena that imposes upon the recipient the onerous task of producing great quantities of records which have no relevance should be quashed. The subpoena to AT&T seeking "all records" relating to Mr. Wade's cellphone number for roughly 12 months and all location data associated with the phone is overbroad and unenforceable. Nonetheless, AT&T failed to even object to the subpoena before producing the unredacted records within three days of receiving the request.

### 4.    AT&T produces nearly 14,000 pages of Special Assistant District Attorney Wade's sensitive information to criminal defendants.

85.    What AT&T did not disclose in its email to Mr. Wade is that it had already pulled and was prepared to produce more than 13,900 pages of his personal cell phone records on the criminal defendants and their attorneys.

86.    On Wednesday, February 14 at approximately 7:08 a.m. ET,[61] AT&T ran five separate reports:

---

[61] The highly sensitive call, text, and location records were produced in 5 reports with a key explaining their terms. Each of the reports has a "Run Date" and time. Each report is dated February 14, 2024 and the run times range from 7:07 to 7:08 ET.

1. **Mobility (with cell location) Report:** 13,348 pages of Mr. Wade's call and text records, including the originating and terminating number, the time and date, the length of the call, and the location of Mr. Wade's call at the time (in longitude and latitude). The data spans two periods: January 1, 2021 through December 1, 2021 and January 15, 2024 through February 10, 2024.

2. **Historical Precise Location Information Report:** 155 pages of Mr. Wade's precise location data. The report shows his number, the time and date of the connection, an exact longitude and latitude of his location at the time, and a "location accuracy" metric disclosing accuracy within meters (e.g., "Location accuracy likely better than 50 meters"). The data spans January 15, 2024 through February 10, 2024.

3. **Timing Advance Location Information Report:** 155 pages of Mr. Wade's precise location data, calculated a different way than the precise location report (per the key provided, Timing Advance data is a "network measurement of the time it takes for a signal to travel from the tower to the device and back"). This report spans January 15, 2024 through February 10, 2024 and discloses Mr. Wade's number, the time and date of the connection, and his approximate longitude and latitude.

4.    **Wireline Report:** 245 pages of Mr. Wade's call records to or from a landline number, including the originating and terminating numbers, the time and date, and the length of the calls. The data spans two periods: January 1, 2021 through December 1, 2021, and January 15, 2024 through February 10, 2024.

5.    **International Report**: 2 pages of Mr. Wade's international calls, including the originating and terminating number, the time and date, the length of the call, and the countries where dialed and answered. The data spans two periods: January 1, 2021 through November 30, 2022, and January 15, 2024 through February 9, 2024.

87.    None of these reports contain any redactions or any privacy or confidentiality designations. Nor did AT&T *ever* object to the sweeping scope—despite its rights to do so under Georgia law.

88.    On February 15, 2025, AT&T sent all five reports—spanning nearly 14,000 pages and detailing Mr. Wade's communications and movements in fine detail across 12 months—via email to counsel for the criminal defendants in the criminal case Mr. Wade was prosecuting. AT&T did not present a witness at the February 15 hearing.

89.    In a February 23, 2024 filing, an investigator retained by Mr. Trump (Charles Mittelstadt) told the court that he had personally served the request on

AT&T and received the records "[o]n the morning of February 15, 2024."[62] As Mr. Mittlestadt noted in his public filing: he was able to use this data to locate Mr. Wade's residence.

90.    In this filing, Mr. Mittelstadt repeatedly remarked on the sheer breath of the records and the unique nature of the production, stating that "[i]t is difficult to understate the amount of data in this scenario" and pointing out that "[u]nder normal circumstances, analysis is conducted on data involving *far narrower record periods*, perhaps a few days or even a few weeks."[63]

91.    Mr. Mittelstadt then used the records in a program called CellHawk, which he represented "is used throughout the United States and Georgia *by law enforcement* agencies" to compile detailed "maps" of Mr. Wade's highly sensitive cell phone usage and location data. These maps showed all interactions between Mr. Wade and the District Attorney and all of Mr. Wade's phone's activity in certain neighborhoods.[64]

92.    One of the defense lawyers to whom AT&T produced the records, Mr. Sadow (representing Mr. Trump) shared Mr. Wade's unredacted records with a

---

[62] Supp. Defense Exhibit 38 to the Hearing on Defendants' Mot. to Dismiss and Disqualify, *Georgia v. Trump*, No. 23SC188947 (S. Ct. GA Feb. 23, 2024) ("Mittlestadt Supp. Ex. 38").

[63] *Id.* (emphasis added).

[64] *Id.*

reporter.[65] Likewise, Mr. Mittelstadt's report containing Mr. Wade's personal contact information, obtained from the AT&T records, was initially filed publicly and quickly distributed on social media.[66]

93.    In a March 1, 2024 hearing, lawyers for the State testified in Superior Court that the unredacted versions of these extremely sensitive cell phone records were leaked, leading to the widespread dissemination of Mr. Wade's personal information.[67] Details from the records appeared broadly on social media and, as a result, Mr. Wade experienced an immediate surge of threats to his safety.

## C.    Contrary to AT&T's public representations, it did not protect Mr. Wade's personal cell phone information or privacy.

94.    AT&T's disclosure of sweeping data revealing a year's worth of Mr. Wade's exact movements and communications was an egregious violation of Mr. Wade's privacy rights and a betrayal of the promises AT&T makes to its users, particularly FirstNet users to whom AT&T promises that it prioritizes public safety and offers "unprecedented security."

---

[65] *See* State's Objection to and Mot. to Exclude Supp. Ex. 38, *Georgia v. Trump*, No. 23SC188947 (S. Ct. GA Feb. 23, 2024) at 8.

[66] *Id.*

[67] Mar. 1, 2024 Hearing Tr., *Georgia v. Trump*, No. 23SC188947 (S. Ct. GA Mar. 1, 2024) at 139-140.

95.     AT&T told Mr. Wade, like all of its users, that "[a]t AT&T, we take our responsibility to protect your information and privacy very seriously."[68] It failed to live up to this responsibility.

**1.     AT&T failed to provide adequate notice.**

96.     AT&T failed to provide adequate notice to Mr. Wade that it had already pulled—and would imminently send to the lawyers for criminal defendants who Mr. Wade was investigating—nearly 14,000 pages of records revealing intimate details of his personal and professional life.

97.     AT&T explicitly told users that it recognizes that "consumers expect companies to safeguard their personal data and manage it responsibly" and represented that "[a]t AT&T, we have a *fundamental commitment to safeguard consumer* and employee *personal data while offering meaningful choice and transparency.* We maintain our commitment through our principles of transparency, security, choice and control, and integrity."[69]

98.     AT&T's failure to tell Mr. Wade that it had pulled and was preparing to produce within 24 hours nearly 14,000 pages of highly sensitive personal data— including by calling him, leaving a voicemail, sending him a text message, or sending mail to his address on record—deprived him of any "transparency" into

---

[68] Ex. B at 2.

[69] AT&T, "Privacy" (as of Dec. 10, 2023), *available at* https://web.archive.org/web/20231210044119/https://sustainability.att.com/priority -topics/privacy.

what personal data was being accessed and by whom. It also deprived him of any "choice or control" to prevent AT&T's disclosure through legal action.

99.     In August 2022, in the midst of an investigation by the Federal Communications Commission (FCC) into AT&T's failure to protect consumer location data, AT&T's Executive Vice President, Joan Marsh represented that the company "is committed to protecting our customers' privacy and securing their information" and that "practices governing the retention and sharing of customers' location information are 'of utmost importance to consumer safety and privacy.'"[70] She reported that "[t]o that end, our global privacy program is based on four simple principles:"[71]

- **Transparency**. We're open and honest about how we use your data.
- **Choices and control**. We give you choices about how we use your data.
- **Security**. We use strong safeguards to keep your data confidential and secure.
- **Integrity**. We do what we say.

100.   In discussing the disclosure of location data in response to *valid* subpoenas, Ms. Marsh told the FCC that it is AT&T's practice "to provide notice to customers and an opportunity to object when a customer's records are the target

---

[70] Letter from J. Marsh to Hon. Jessica Rosenworcel (Aug. 3, 2022) at 1-2, *available at* https://docs.fcc.gov/public/attachments/DOC-386581A1.pdf.

[71] *Id.* at 1.

of a civil or criminal defense subpoena to the extent such notice is legally permissible."[72]

101.   Here, AT&T provided neither actual notice nor any meaningful opportunity to object: it failed to actually make contact with Mr. Wade before producing his highly sensitive data. Even its lackluster attempt at "notice" provided him *less than 24 hours* to seek court intervention before the records were disseminated.

102.   Likewise, AT&T tells users in its 2023 Privacy Policy (in the section titled "More choices and controls") that "details about who you call" and location data (a type of data called CPNI, discussed below), will not be shared "outside of our AT&T affiliates, agents and suppliers *without your consent* except for court orders, fraud detection, providing service, network operations and security, aggregate (grouped) information that doesn't identify you personally and as otherwise authorized by law."[73]

103.   AT&T never received Mr. Wade's consent. As discussed below, the Roman AT&T Subpoena was neither court ordered nor authorized by law.

---

[72] *Id.* at 5.

[73] Ex. A at 11 (emphasis added).

104.   AT&T's failure to provide notice and obtain Mr. Wade's consent violated AT&T's own core principles and breached its promises to Mr. Wade and the FCC.

### 2. AT&T's review of the Roman AT&T Subpoena was grossly negligent.

105.   AT&T repeatedly claims—to its users and to the FCC—that it has not only an established system to vet subpoenas before producing documents but also a dedicated team of "specialists" to do so. Despite these claims, AT&T's review of the secret Roman subpoena before responding was grossly negligent.

106.   In its 2023 Transparency Report, AT&T details how it responds to subpoenas like the Roman AT&T Subpoena. It tells its users that "[b]efore we respond to **any** legal demand, we determine that we have received the correct type of demand based on the applicable law for the type of information sought."[74]

107.   It made similar representations to the FCC in 2022: "Like all companies, we are required by law to provide information to law enforcement and other government entities by complying with court orders, subpoenas, and lawful discovery requests. *In all cases, we review requests to determine whether they are valid*."[75]

---

[74] Ex. B at 5 (emphasis in original).

[75] Letter from J. Marsh to Hon. Jessica Rosenworcel (Aug. 3, 2022), *supra* n.78, at 5.

108.    In fact, AT&T advertises that it has a group of specialists trained to do

exactly this review.[76] As AT&T has described:

> The Global Legal Demand Center (GLDC) is a team of
> specialized, wireless and wireline court order compliance
> professionals focused on providing law enforcement, officers of
> the court, Public Safety Answering Points and other legal
> contacts with the best possible customer service in the
> telecommunications industry. The GLDC is located in North
> Palm Beach, Florida, and currently responds to all search
> warrant and court ordered requests nationwide for wireless and
> wireline customer records. The goal of this team is to comply
> with criminal process and provide assistance to federal, state
> and local law enforcement agencies, attorneys, and customers
> pursuant to that process. *At the same time, the team must ensure*
> *that they adhere to all applicable state and federal laws and*
> *protect the privacy of our customers*.[77]

109.    In its email to Mr. Wade, AT&T represented that this same group of

"specialists" was responding to the Roman AT&T Subpoena.[78]

110.    On information and belief, AT&T took no steps to investigate the

validity or sufficiency of the subpoena. A cursory review would have revealed the

highly unusual and suspicious nature of the subpoena, the fact that it was not

supported by the probable cause *that AT&T requires* to release this type of

sensitive information (location data and call and text logs), and that the relevant

---

[76] On information and belief, this Global Legal Demand Center is a part of
AT&T Mobility.

[77] AT&T, "AT&T Global Legal Demand Center" (August 17, 2023), *available*
*at* https://www.nct911.org/wp-content/uploads/2020/03/2020_03_ATT_NCC_24-
X-7-Contact.pdf.

[78] *See* Ex. D ("The AT&T Global Legal Demand Center responds to subpoenas
addressed to AT&T companies ('AT&T').We have received the enclosed civil
subpoena directing AT&T to disclose information about you, your account, or one
or more phone numbers associated with you.").

Georgia statute *did not* require AT&T to produce documents without notice or a court appearance—and explicitly allows AT&T to object to the striking overbreadth and lack of legal support.

111.    *First*, on information and belief, AT&T did not contact the Clerk of the Court's office to verify the subpoena was issued for a valid case, as instructed on the face of the subpoena. Nor did AT&T contact Mr. Wade or the District Attorney's Office to confirm the subpoena was valid and "the correct type of demand based on the applicable law for the type of information sought." Had AT&T done so, it would have learned that Georgia law does not permit discovery on prosecutors except in exceptionally rare circumstances not presented here—as confirmed by the Superior Court in its order quashing the Synovus Bank subpoena.

112.    *Second*, in its email, AT&T categorized the subpoena as a "civil subpoena" despite it clearly being issued in a *criminal case*—demonstrating a lack of even a minimal amount of effort to ascertain what information was sought and whether the subpoena was valid and the demand consistent with governing law.

113.    *Third*, a simple review of the face of the subpoena showed it concerned an individual (Mr. Wade) who was not the named defendant in the criminal case caption (*State v. Roman*) and that it was not signed by the State, but rather than a private defense lawyer. A cursory review would have revealed (or,

alternatively, AT&T's "specialists" knew or should have known) that there is no right to generalized discovery in criminal cases in Georgia.

114. *Fourth*, AT&T was on notice that Mr. Wade was a *member of law enforcement* because he was a subscriber to AT&T's FirstNet service—an offering made available exclusively to law enforcement and public safety officials. In fact, AT&T was specifically aware that Mr. Wade was a prosecutor because he had to present his credentials to establish his eligibility for enrollment in FirstNet.

115. *Fifth*, the subpoena was issued under to O.C.G.A. § 24-13-23, which *does not require AT&T* to produce *any documents*. Instead, the statute requires AT&T to appear in court with the documents.[79] This procedure matters. The reason that the statute does not require notice to the opposing party is because the subpoenas can only compel attendance at a hearing and the production of documents at the hearing, and the parties can object or move to quash *at that hearing*.[80] While Defendant Roman's counsel included a statement in her Attachment A that production via email was acceptable, AT&T's Global Legal Demand Center "specialists" failed their duty to confirm that producing the

---

[79] *See* O.C.G.A § 24-13-21; *id.* § 24-13-23(a).

[80] *See* State Disciplinary Board, Advisory Opinion No. 40 (Sept. 21, 1984) ("There is no need for notice of a subpoena issued pursuant to [the predecessor of O.C.G.A. § 24-13-23(a)] because all parties receive notice of hearings and trials, so long as they are real hearings and real trials.").

documents in this manner would "adhere to all applicable state and federal laws and protect the privacy of our customers." It did not.

116.   *Sixth*, the subpoena was not supported by *any additional documents*. There was no court order or search warrant, and thus no evidence of any probable cause—the very thing that AT&T *says it requires* before producing this type of sensitive material.

117.   *Seventh*, the subpoena makes no mention of any protective order or other order to limit disclosure of the requested information. Despite AT&T's acknowledgement that this kind of data warrants the highest level of protection and that customers like Mr. Wade are entitled to expect that protection from AT&T,[81] AT&T took no steps to confirm that if produced, the records would be sufficiently protected and not shared elsewhere nor publicly filed. AT&T could have, for example, objected to production without such an order, a commonplace response to a subpoena when sensitive documents are at issue. AT&T requested no such protection and did not even label the produced documents as confidential, and thus they were not adequately protected against widespread dissemination—including the highly foreseeable use in open court or filing on a public docket. AT&T could, and should, have objected to producing these documents without any such limitations or protections.

---

[81] Ex. B at 6.

118.    *Eighth*, the sweeping breadth of the requests should have put AT&T on notice. The subpoena sought nearly 12-months of call, text, and highly sensitive location data. As Defendant Trump's investigator told the Superior Court, "[i]t is difficult to understate the amount of data in this scenario" and pointing out that "[u]nder normal circumstances, analysis is conducted on data involving far narrower record periods, perhaps a few days or even a few weeks."[82] This request was far from the ordinary, as AT&T's "specialists" should have immediately recognized.

119.    Knowing that Mr. Wade was a prosecutor and that the request came from a criminal defendant's counsel or private investigator and combining that knowledge with the sweeping request for massive amounts of data should have at least caused AT&T to pause and conduct the basic due diligence that it tells its users (and the FCC) it conducts before releasing such sensitive data—particularly in this context, where AT&T markets FirstNet to government officials and law enforcement precisely because of its purported benefits to public safety and superior ability to protect public servants' data. AT&T failed to do so.

120.    *Finally*, the timing of submission and compliance concerning the subpoena raise serious questions about AT&T's conduct.

---

[82] Mittlestadt Supp. Ex. 38.

121.   The subpoena was sent via a private investigator for a different defendant (Mr. Trump) at 11:27 a.m. ET on Monday, February 12 to "AT&T/Cingular, National Compliance Center, 707-435-6409."

122.   By 7 a.m. ET on Wednesday, February 14—less than 48 hours later—AT&T's Global Legal Demand Center (a different entity that the subpoena was addressed to) ran the requests for data before emailing Mr. Wade about the subpoena later that day.

123.   On Thursday, February 15, 2024, the data was produced to Defendant Roman's counsel with no redactions, objections, or security designations.

124.   Not only does this timeline provide little to no time for Mr. Wade to exercise his legal rights, but it is also inconsistent with AT&T's own representations about how subpoenas are reviewed and handled.

125.   In its 2023 Transparency Report, AT&T says it rejects demands that are "not correctly addressed to AT&T" or do not "contain all the elements necessary for a response."[83] Here, the subpoena was addressed to "AT&T/Cingular" – the wrong entity. Mr. Wade was an active AT&T FirstNet, not Cingular, customer. Further, the subpoena was addressed to the "National Compliance Center" and sent to a different fax number than that provided by AT&T for this purpose. Despite the subpoena being addressed to the wrong entity

---

[83] Ex. B at 7.

and the wrong division and sent to the wrong fax, AT&T responded within 48 hours—from a different entity (the Global Legal Demand Center) with an entirely different fax number.

126. Additionally, the request did not "contain all the elements necessary for a response": despite requesting sensitive location data and call and text logs, it was *not* supported by any evidence of probable cause.

127. Despite the overwhelming evidence that AT&T had not "received the correct type of demand based on the applicable law for the type of information sought," AT&T released nearly 14,000 pages of Mr. Wade's cell site location information and other cellular records to the criminal defendants that Mr. Wade was prosecuting, including cell site location information, call logs, and text logs within days of receiving the subpoena. This disclosure violated the law and AT&T's internal policies and procedures.

**3.    AT&T failed to require any evidence of probable cause before releasing 12 months of highly sensitive location data.**

128. AT&T is clear with its users: "We require a search warrant based on the probable-cause standard for *all demands for real-time or historical location information*, except in emergency situations."[84] AT&T is also clear about how probable cause is established, telling its users:

> Search Warrants and Probable Cause Court Orders are signed by a judge, and they are issued only upon a finding of "probable

---

[84] *Id*. (emphasis added).

cause." To be issued, the warrant or order must be supported by sworn testimony and sufficient evidence to believe the information demanded is *evidence of a crime*. Probable cause is viewed as the highest standard to demand evidence.[85]

129.    Despite this clear and consistent commitment, AT&T produced more than 13,000 pages of Mr. Wade's location data—his longitude and latitude at the time of *every phone call* and *every text message* across 12 months spanning 2021 and 2024—without a search warrant, court order, or *any* evidence of probable cause.

130.    What facts AT&T did have made clear that the subpoena was not supported by probable cause. Mr. Wade was not accused of any crimes; he was prosecuting them. AT&T knew that the subpoena came from a criminal case (*State v. Roman*), that Mr. Wade was not the named defendant in that case, and that Mr. Wade was a prosecutor. AT&T knew or should have known that there was no probable cause to support the Roman AT&T subpoena's request for troves of Mr. Wade's location data.

131.    Indeed, AT&T produced this data without *any* details of why it was requested. The subpoena was not supported by *any* additional documentation (such as a search warrant or court order, as AT&T states it requires) to support the sprawling nature of its requests. Nonetheless, AT&T produced all the data within

---

[85] *Id.* at 6.

three days of receipt of the subpoena—to lawyers representing criminal

defendants—with no restriction on its dissemination or use.

132.   AT&T's release of highly sensitive location data, which revealed all

of Mr. Wade's movements, contacts, and frequented locations (including his home)

across 12 full months, violated its explicit promises to its users, as well as federal

and state law.

**D.    AT&T's conduct violates federal law designed to protect sensitive
        consumer cell information.**

133.   Not only did AT&T's disclosure of Mr. Wade's location and call and

text data violate AT&T's policies and promises, it also violated the federal law

designed to protect precisely this data.

134.   Recognizing the sensitivity of data collected by cell carriers,

Congress, through the Federal Communications Act (FCA), requires

telecommunications providers—including AT&T—to protect their customers'

sensitive personal information to which they have access as a result of their unique

position as telecommunications carriers.[86]

135.   Congress enacted the FCA to "define[] three fundamental principles

to protect all consumers. These principles are: (1) the right of consumers to know

the specific information that is being collected about them; (2) the right of

---

[86] 47 U.S.C. § 222.

consumers to have proper notice that such information is being used for other

purposes; and (3) the right of consumers to stop the reuse or sale of that

information."[87]

136.    Pursuant to the FCA, AT&T has a duty to protect the confidentiality

of certain types of customer data called proprietary network information or CPNI.[88]

Call and text logs and location data all qualify as CPNI that must be safeguarded

under the statute.[89] As AT&T admits to its users, "It is your right and our duty

under federal law to protect the confidentiality of your CPNI."[90]

137.    Under the FCA, AT&T is not just liable for its own violations of the

Act, but also for violations that it "cause[s] or permit[s]."[91]

---

[87] H.R. Conf. Rep. No. 458, 104th Cong., 2d Sess. 204 (1996) (Joint Explanatory Statement of the Committee of Conference); *see also* H.R. Rep. No. 204, 104th Cong., 1st Sess. 91 (1995); *id.* at 90 (explaining that section 222 of the FCA balances "the need for customers to be sure that personal information that carriers may collect is not misused" with customers' expectation that "the carrier's employees will have available all relevant information about their service.").

[88] 47 U.S.C. § 222(a).

[89] 47 U.S.C. § 222(h)(1); *Carpenter*, 585 U.S. at 405 (Gorsuch, J., dissenting) ("47 U.S.C. § 222 designates a customer's cell-site location information as 'customer proprietary network information' (CPNI)"); Ex. A at 11 ("CPNI is information related to the telecommunications services you purchase from us, such as … details about who you called.").

[90] Ex. A at 11.

[91] *See* 47 U.S.C. § 206 (establishing that "[i]n case any common carrier shall do, or cause or permit to be done, any act, matter, or thing in this chapter prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this chapter required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter.").

138.    Pursuant to the FCA, the FCC has developed comprehensive rules and regulations concerning AT&T's obligations under its duty to protect customers' CPNI.[92] These rules require, among other things, the proper notice carriers must provide and the consent they must obtain before disclosing their customers' proprietary data and the steps they must take to safeguard that data. AT&T has failed to abide by these regulations concerning notice, consent, and proper safeguarding requirements.

139.    *First*, FCA regulations require AT&T to provide "[i]ndividual notice … when soliciting approval to use, disclose, or permit access to customers' CPNI."[93] That notice must "provide sufficient information to enable the customer to make an informed decision as to whether to permit a carrier to use, disclose, or permit access to, the customer's CPNI"—including by disclosing exactly what data will be disclosed.[94]

140.    AT&T failed to provide sufficient notice to Mr. Wade before disclosing his CPNI: it failed to actually contact him and failed to disclose the types of data it would be producing in response to the subpoena, preventing Mr. Wade from knowing about the upcoming disclosure, let alone make an informed

---

[92] *See* 47 C.F.R. § 64.2001 ("The purpose of the rules in this subpart is to implement section 222 of the Communications Act of 1934, as amended, 47 U.S.C. 222.").

[93] 47 C.F.R. § 64.2008(b).

[94] 47 C.F.R. § 64.2008(c).

decision about its release. Further, by the time AT&T sent its unsigned letter to Mr. Wade's spam folder, it had already pulled the five reports it planned to produce and thus knew exactly what data would be disclosed. Nonetheless, AT&T failed to provide *any* of the details about its forthcoming production to Mr. Wade, in violation of the FCA.

141.    *Second*, FCA regulations prohibit the disclosure of CPNI except in three situations: (1) as required by law; (2) with the customer's approval; or (3) in its provision of telecommunications services.[95] Beyond such use, "the Commission's rules require carriers to obtain a customer's *knowing consent* before using or disclosing CPNI."[96]

142.    AT&T recognizes this requirement. In its privacy policy, it promises that AT&T doesn't "share CPNI outside of our AT&T affiliates, agents and suppliers *without your consent* except for court orders, fraud detection, providing service, network operations and security, aggregate (grouped) information that doesn't identify you personally and as otherwise authorized by law."[97]

---

[95] 47 U.S.C. § 222.

[96] Report and Order and Further Notice of Proposed Rulemaking, *In the Matter of Implementation of the Telecommunications Act of 1996: Telecommunications Carriers Use of Customer Proprietary Network Info. & Other Customer Info.*, 22 F.C.C. Rcd. 6927 ¶ 8 (2007) ("2007 CPNI Order").

[97] Ex. A at 11 (emphasis added).

143.   AT&T failed to obtain Mr. Wade's knowing consent before disclosing his CPNI, in violation of the FCA. The disclosure was not supported by a court order nor authorized by law—which provides no generalized right to discovery in criminal cases much less the exceptional scope of prosecutorial discovery AT&T facilitated here.

**E.    AT&T's unlawful disclosure of Mr. Wade's private cell phone data caused significant harm.**

**1.    Mr. Wade has suffered significant harm as a result of AT&T's disregard for his safety and privacy.**

144.   Mr. Wade is a lifelong public servant. When asked by the State, he agreed to step aside from his successful law practice to investigate and prosecute an unprecedented attempt to interfere in Georgia's presidential election by some of the most powerful individuals in the country, including a former president.

145.   This decision put Mr. Wade in the limelight, but he at all times rightfully expected that his cell phone carrier would abide by its legal obligations (and its own promises) to safeguard his data and protect his privacy and safety. By disregarding its legal obligations and its own policies and procedures, AT&T put Mr. Wade at significant risk and caused him substantial emotional and economic harm. It also undid the ongoing efforts of the District Attorney's Office to keep this same, highly sensitive information private for Mr. Wade's protection.

146.   The vast location data contained in the nearly 14,000 pages of records revealed sweeping details about Mr. Wade's personal life. It showed the location

of his home, the places he frequented, and the locations of his friends' and associates' homes, as well as First Amendment protected activities including with whom he associated and where he worshipped. It allowed complete strangers to put together composites of his routines: they knew where he slept, where he ate, where he exercised, what doctors he visited, and where he socialized (and when he was likely to be at each location based on 12 months of historic data). Worse, this data was disclosed to criminal defendants whom Mr. Wade was prosecuting, allowing them an intimate window into his movements and associations.

147. As the Supreme Court found, this kind of location data "provides an intimate window into a person's life, revealing not only his particular movements, but through them his 'familial, political, professional, religious, and sexual associations…. These location records hold for many Americans the 'privacies of life.'"[98]

148. When such intimate data is disclosed, it creates a breach of the most fundamental expectations of privacy. As observed by the Supreme Court, cell phone location data "present[s] even greater privacy concerns than the GPS monitoring of a vehicle … [A] cell phone—almost a 'feature of human anatomy,' tracks nearly exactly the movements of its owner. While individuals regularly leave their vehicles, they compulsively carry cell phones with them all the time. A

_____

[98] *Carpenter*, 585 U.S. at 311 (citation modified).

cell phone faithfully follows its owner beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales."[99]

149.    Likewise, the call and text logs AT&T disclosed revealed everyone Mr. Wade had spoken with over a total of 12 months, as well as their contact information, including the phone numbers of his children, his spouse, and myriad other private individuals who each had their own expectation of privacy concerning their cell numbers and private contacts with Mr. Wade. Those private communications were exposed to criminal defendants, their counsel, and myriad unknown third parties.

150.    The FCC has recognized that the unauthorized disclosure of carrier customers' personal information "by any method invades the privacy of unsuspecting consumers and increases the risk of identity theft, harassment, stalking, and other threats to personal safety."[100] In a report on the need for cell phone carriers to carefully safeguard their users' private cell phone data (including location data), the FCC reported that "[t]he reality of this private information being disseminated is well-documented and has already resulted in *irrevocable damage to customers*."[101]

---

[99] *Id.*

[100] 2007 CPNI Order ¶ 46.

[101] *Id.* at ¶ 39.

151. Mr. Wade's experience exemplifies this risk. AT&T's reckless disclosure of Mr. Wade's location data allowed criminal defendants, their counsel, and unknown third parties to track where Mr. Wade went, how frequently he traveled there (and when), how long he stayed, who he talked to, how often they talked, and for how long. It allowed complete strangers and persons facing imprisonment as a result of the prosecutions led by Mr. Wade to piece together a picture of Mr. Wade's life and habits that put him in danger, particularly because of his involvement in a public criminal investigation that became a political lightning rod.

152. The risk prosecutors face from the criminal defendants they prosecute on behalf of the public are well known. Here, the risks were even greater given the public and political nature of the prosecution. Indeed, a former governor was (understandably) unwilling to take on the protections that such risks would require. Likewise, the District Attorney's Office retained a team of investigators who were tasked with monitoring for and removing any private details of Mr. Wade's team available on the internet to protect that team's safety.

153. All those efforts were wasted once AT&T released Mr. Wade's private information to the criminal defendants and their counsel, all without any redactions or other protections for Mr. Wade's or his associates' privacy and safety. The records, which AT&T failed to produce pursuant to any order that

would have limited distribution (e.g., a protective order), were shared with the media and immediately broadly shared on social media, exposing Mr. Wade's personal details.

154.   Almost immediately, strangers identified the location of Mr. Wade's home (as Mr. Mittelstadt told the Superior Court he was able to do through the disseminated AT&T data alone). Scores of unknown people began appearing outside Mr. Wade's home at all hours of the day and night. His once peaceful neighborhood became unsafe overnight: Mr. Wade had no way of knowing who was waiting outside his door or why. His mailbox and voicemail were flooded with extreme threats of violence, including racially motivated threats. Mr. Wade had no way of knowing whether the people threatening to lynch him were the same people sitting in cars outside his home. His home was no longer safe and he warned his children they could not visit him.

155.   Likewise, every place Mr. Wade frequented was now made public: his gym, his friends' homes, his favorite restaurants, his medical providers. Mr. Wade immediately began being approached by strangers, often hostile and threatening, at the places he frequented in his personal life. Each of these interactions created immense emotional distress.

156.   To regain any sense of peace and security within his own home, Mr. Wade required the presence of off-duty police officers outside his home around the

clock. His neighbors likewise regularly expressed concern and fear about the deluge of strangers on their street.

157.   As a direct and foreseeable result of AT&T's breach of Mr. Wade's privacy, he has been negatively and detrimentally affected by the public disclosure of his personal information.

### 2.   AT&T's violation of prosecutorial privacy is a serious breach of public safety, with detrimental consequences.

158.   AT&T's disclosure of prosecutors' private information does not just put the individual prosecutors at risk: it creates a significant threat to public safety.

159.   The American legal system depends on the employees of prosecutors' offices to investigate and prosecute crimes—including crimes committed by dangerous, well-connected, and/or powerful defendants. A failure to protect the public servants who take on this role not only betrays the very people who work to keep the public safe, it undermines the system's ability to protect and serve the public.

160.   The threats prosecutors face as a consequence of their service—and the efforts they undertake to protect themselves—are well recognized and rising. The *day before* AT&T improperly and unlawfully disclosed Mr. Wade's private cell phone data, a study by the U.S. Marshals service reported that threats against

federal prosecutors *more than doubled* in 2023.[102] Many of these threats were aimed at officials, like Mr. Wade, connected to cases against President Trump.[103]

161.   In light of these threats, many prosecutors' offices take measures to protect their staff. Indeed, to this end, the District Attorney's Office employed individuals tasked with the specific job of making sure that the home addresses and other personal details of employees working on the Trump election interference case (including Mr. Wade) were not publicly leaked. These efforts were decimated by AT&T's unlawful disclosure of Mr. Wade's cell phone data.

162.   Breaches of prosecutors' data and privacy also endanger the private citizens with whom they work and on whom they rely to keep the public safe. Records of Mr. Wade's calls, texts, and location data revealed sensitive information about the State's investigation (e.g., the identity of witnesses and cooperators). Disclosing such individuals to the criminal defendants and their attorneys can put them at significant risk and undermine public safety by discouraging witness cooperation with law enforcement.

163.   Here, AT&T's unlawful disclosure revealed many of the people with whom Mr. Wade had spoken and secured immunity deals and disclosed their

---

[102] Holmes Lybrand, "US Marshals director calls increase in threats to judges and prosecutors 'a substantial risk to our democracy,'" CNN (February 14, 2024), *available at* https://www.cnn.com/2024/02/14/politics/threats-to-judges-increase.

[103] *Id.*

contacts and potentially their location to the criminal defendants they were asked to help investigate. Such a sweeping breach endangered not just Mr. Wade, but countless innocent fact witnesses in an investigation concerning the former President of the United States.

164.  The unique aspects of the particular case further warranted heightened protection, as reflected by Fulton County prosecutors' efforts to urge the court "to restrict defendants, the media and anyone else from publicizing the identities of future jurors in the Georgia criminal case focused on former President Donald Trump."[104] Notably, the "request [came] after members of the grand jury that indicted Trump and his allies in August [2023] for a sweeping racketeering conspiracy had their personal information published on a far-right website."[105]

165.  As Atlanta Police Chief Darin Schierbaum explained, "grand jurors were subject to harassment and threats after their home addresses, phone numbers and vehicle information were posted on a website operated by a Russian company," following which "local law enforcement enacted an operational plan to protect grand jurors, which he says is now straining agency resources."[106]

---

[104] Sam Gringlas, "'New Territory in Georgia,' as Prosecutors Want Jurors' Names Shielded In Trump Case," NPR.org (Sept. 7, 2023), *available at* https://www.npr.org/2023/09/07/1198288859/trump-georgia-trial-jurors-protection.

[105] *Id.*

[106] *Id.*

166.    Mr. Wade is a public servant who agreed to investigate and prosecute efforts to undermine democracy in Georgia. AT&T knew he was a prosecutor. It regularly promoted the FirstNet service as protecting people just like Mr. Wade in the critical roles they serve. AT&T's failure to protect Mr. Wade's private cell phone data endangered not just him but public safety at large—the very cause that AT&T promised to embrace when it secured its FirstNet contract. AT&T must be held accountable.

### V.    CAUSES OF ACTION
### COUNT I:
### The Federal Communications Act (47 U.S.C. § 201 *et seq.*)

167.    The plaintiff realleges and incorporates all of the preceding paragraphs as though fully set forth in this cause of action.

168.    AT&T has violated 47 U.S.C. § 222(a) by failing to protect the confidentiality of Mr. Wade's CPNI in the form of precise, real-time location data and call and text logs, as detailed herein.

169.    AT&T has violated 47 U.S.C. § 222(c) by using, disclosing, and/or permitting access to the plaintiff's CPNI in the form of precise location information and call and text logs to criminal defendants, their counsel, and other third parties without the notice, consent, and/or legal authorization required under the FCA, as detailed herein.

170.    AT&T has violated 47 U.S.C. § 222(f) by using, disclosing, and/or permitting access to Mr. Wade's CPNI, including precise location data and call and

text logs, without the express prior authorization of the plaintiff, as detailed herein, in violation of the FCA.

171.   Mr. Wade has suffered injury to his person, property, and health as a consequence of AT&T's violations of the FCA. He has been harmed by the unauthorized access to his CPNI and personal information without his consent and by AT&T's failure to secure his CPNI.

172.   Additionally, Mr. Wade has suffered emotional damages, including emotional distress, mental anguish, and suffering, as a result of AT&T's acts and practices. Mr. Wade would not have purchased, or would have paid less for, AT&T's FirstNet wireless services had he known his CPNI would not be protected and would instead be accessed and disseminated without notice, consent, or lawful authority.

173.   Mr. Wade seeks the full amount of damages sustained as a consequence of AT&T's violations of the FCA, together with reasonable attorney's fee, to be fixed by the Court and taxed and collected as part of the costs of the case.

174.   Mr. Wade also moves for a writ of injunction or other proper process, mandatory or otherwise, to restrain AT&T and its officers, agents, or representatives from further disobedience of the FCA's requirements, particularly as they relate to FirstNet users subject to subpoenas in criminal cases wherein they are not the criminal defendant.

## COUNT II:
## Intrusion Upon Seclusion

175.   The plaintiff realleges and incorporates all of the preceding

paragraphs as though fully set forth in this cause of action.

176.   AT&T intentionally intruded on and into the plaintiff's solitude,

seclusion, or private life by providing criminal defendants, their counsel, and other

third parties with access to his location data and call and text logs without proper

notice, consent, or authority. Mr. Wade's private life include his behavior on his

mobile device, his personal communications (as well as confidential professional

communications), and his location data.

177.   AT&T's intrusion is highly offensive and would be to any reasonable

person. Mr. Wade had a reasonable expectation of privacy in his mobile data,

including his location data and call and text logs. His right to privacy is enshrined

in the Georgia Constitution (Chapter 1, Article 1). It is protected by federal statutes

(including the FCA) and by Georgia statutory and common law, has been routinely

recognized by the Supreme Court, and is reflected in the myriad regulations

governing the requirements that sensitive phone data be protected, as well as

enforcement actions undertaken by the FCC and countless studies, op-eds, and

articles decrying the invasive nature and risks presented by unauthorized

dissemination of private phone data.

178.   His expectation of privacy was particularly reasonable given AT&T's unique access to his private mobile device and data, as well as the requirements imposed by AT&T under state and federal law.

179.   AT&T has admitted that Mr. Wade has a reasonable expectation of privacy in his location data and call and text logs, each of which qualify as CPNI. In its 2023 Transparency Report, AT&T admits that it bears "responsibility to protect [users'] information and privacy" and represented that it took that responsibility "very seriously."[107] In a Customer Privacy Issue Brief linked at the 2023 Transparency Report, AT&T recognizes that "consumers expect companies to safeguard their personal data and manage it responsibly."[108]

180.   The offensiveness is heightened by AT&T's material misrepresentations to the plaintiff concerning the security and safeguarding of his cell phone data—including in response to subpoenas, as alleged herein.

181.   Mr. Wade was harmed by the intrusion into his private life, as detailed throughout this complaint. AT&T's actions and conduct complained of herein were a substantial factor in causing the harm suffered by Mr. Wade.

---

[107] Ex. B at 2.

[108] AT&T, "Privacy" (as of Dec. 10, 2023), *available at*
https://web.archive.org/web/20231210044119/https://sustainability.att.com/priority
-topics/privacy.

182.    As a result of AT&T's actions, Mr. Wade seeks monetary and punitive damages in an amount to be determined at trial. He seeks punitive damages because AT&T's actions constituted willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences. Punitive damages are warranted to deter AT&T from engaging in future misconduct to the detriment of consumer privacy and public safety.

183.    The plaintiff seeks the full amount of damages sustained by him as a consequence of AT&T's intrusion upon his seclusion, as well as declaratory and injunctive relief.

### COUNT III:
### Public Disclosure of Private Facts

184.    The plaintiff realleges and incorporates all of the preceding paragraphs as though fully set forth in this cause of action.

185.    AT&T publicly disclosed Mr. Wade's private data—including private facts about his communications, movements, and associations contained therein— to criminal defendants, their counsel, and myriad unknown third parties, leading to widespread disclosure. Through AT&T's actions, Mr. Wade's phone number and address (among other highly personal pieces of information) were publicly disclosed, leading to the immediate influx of strangers and hate mail to his home and incessant threatening calls and voicemails to his personal phone.

186.    As the Supreme Court has recognized, the details contained in the nearly 14,000 pages disclosed by AT&T "hold for many Americans the 'privacies of life.'"[109] Cell phone location data, in particular, "present[s] even greater privacy concerns than the GPS monitoring of a vehicle" because it is "almost a 'feature of human anatomy,'" and "tracks nearly exactly the movements of its owner."[110] Individuals, including Mr. Wade, "carry cell phones with them all the time. A cell phone faithfully follows its owner beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales."[111]

187.    The details about Mr. Wade's life that he (and the District Attorney's Office) had sought to keep private to protect his safety immediately ceased being private, including the location of his home and his private cell phone number. Those private details were immediately shared by the defense counsel to whom AT&T had produced them with the media and were quickly disseminated broadly on public social media.

188.    The disclosure of such private information to criminal defendants, their counsel, and myriad unknown third parties is highly offensive and objectionable to any person of reasonable sensitivities. It defies reasonable

---

[109] *Carpenter*, 585 U.S. at 297.

[110] *Id*. at 311.

[111] *Id*.

expectations of privacy to disclose such personal and revealing details to the criminal defendants a prosecutor is asked to investigate on behalf of the State—particularly with no protections in place to prevent broader dissemination. The natural consequences of producing such data in litigation without objection, redaction, or designation pursuant to a protective order were foreseeable.

189.   The disclosure led to immediate and severe harm, including subjecting Mr. Wade to ongoing dangerous and racist threats at his home and on his now-disclosed cell phone number.

190.   As a result of AT&T's actions, Mr. Wade seeks monetary and punitive damages in an amount to be determined at trial. The plaintiff seeks punitive damages because AT&T's actions constituted willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences. Punitive damages are warranted to deter AT&T from engaging in future misconduct to the detriment of consumer privacy and public safety.

**COUNT IV:**
**Negligence**

191.   The plaintiff realleges and incorporates all of the preceding paragraphs as though fully set forth in this cause of action.

192.   AT&T owed a duty to Mr. Wade to exercise reasonable care in safeguarding his sensitive, personal cell phone information, including CPNI, call

67

and text logs, and/or location data. This duty arises from the sensitivity of precise location data and call and text logs and the foreseeability of harm should AT&T fail to safeguard and protect such data. This duty included, among other things, vetting and reviewing subpoenas for validity before the dissemination of sensitive information, providing plaintiff with proper and timely notice to afford him the opportunity to secure his rights (including by seeking court intervention), and disclosing CPNI only upon confirming valid authority to do so and with appropriate protective measures in place (e.g., a protective order) to prevent further dissemination.

193.   AT&T's privacy policies acknowledged its duty to adequately protect Mr. Wade's sensitive phone data, including location data and call/text logs.

194.   AT&T had independent duties under the FCA and its corresponding regulations, as detailed above, which required AT&T to reasonably safeguard Mr. Wade's CPNI, including location data and call and text logs.

195.   AT&T had a special relationship with Mr. Wade due to its status as his telecommunications carrier, which imposed an independent duty of care. Mr. Wade's willingness to contract with AT&T, and thereby entrust AT&T with his location and cell data, was predicated on the understanding that AT&T would undertake adequate security, consent, and disclosure precautions.

196.   AT&T breached its duties by, *inter alia*: (a) failing to implement, maintain, and execute adequate security practices to safeguard the plaintiff's data; (b) failing to review the criminal defendants' subpoena and confirm its validity; (c) failing to provide the plaintiff with adequate and timely notice that AT&T would be disclosing his private data, (d) disclosing Mr. Wade's personal data to third-parties without consent or authority, and (e) disclosing such highly sensitive data without any limitations on or protections against further dissemination.

197.   But for AT&T's breaches of its duties, Mr. Wade's sensitive data would not have been accessed by unauthorized individuals and the public.

198.   AT&T knew that its actions would likely cause Mr. Wade substantial harm.

199.   Mr. Wade was the foreseeable victim of AT&T's inadequate data security practices, notice and consent mechanisms, and subpoena response protocols. AT&T knew or should have known that unauthorized access would cause damage to Mr. Wade, who AT&T knew or should have known was a member of law enforcement. AT&T's negligent conduct provided a means for unauthorized individuals to ascertain the plaintiff's private location data as well as the location of sensitive locations (e.g., his home and place of worship) and the phone numbers of his personal contacts, including his children.

200.   As a result of AT&T's willful failure to prevent unauthorized access, Mr. Wade suffered injury, which includes, but is not limited to: (i) disclosure of his personal information and the personal information of others stored in his phone, (ii) exposure to a heightened, imminent risk of ongoing harms to his safety, security, privacy rights, and property rights, and (iii) financial harm, including but not limited to measures to counter the harms caused by AT&T.

201.   The damage to Mr. Wade was a proximate, reasonably foreseeable result of AT&T's breaches of its duties.

202.   Mr. Wade is entitled to damages in an amount to be proven at trial. Mr. Wade also seeks monetary and punitive damages in an amount to be determined at trial. The plaintiff seeks punitive damages because AT&T's actions constituted willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences. Punitive damages are warranted to deter AT&T from engaging in future misconduct to the detriment of consumer privacy and public safety.

## COUNT V:
### Attorneys' Fees & Costs under O.C.G.A. § 13-6-11

203.   The plaintiff realleges and incorporates all of the preceding paragraphs as though fully set forth in this cause of action.

204.   Through and in addition to the conduct described above, AT&T has acted in bad faith, has been stubbornly litigious, and has caused Mr. Wade

unnecessary trouble and expense. As a result, Mr. Wade is entitled to recover his litigation expenses, including attorney fees.

## COUNT VI:
### Punitive Damages

205.   The plaintiff realleges and incorporates all of the preceding paragraphs as though fully set forth in this cause of action.

206.   AT&T's actions showed willful misconduct, malice, fraud, wantonness, oppression, and that entire want of care which would raise the presumption of conscious indifference to consequences.

207.   Mr. Wade is therefore entitled to an award of punitive damages in an amount necessary to punish, penalize, and deter such conduct.

## DEMAND FOR RELIEF

208.   **WHEREFORE**, the plaintiff respectfully demands that this Court:

209.   Conduct expedited discovery proceedings leading to a prompt trial on the merits before a jury on all claims and defenses;

210.   Enter judgment against AT&T and in favor of the plaintiff;

211.   Award the plaintiff damages in an amount to be determined at trial, plus interest in accordance with law, including an award of punitive damages pursuant to O.C.G.A. §§ 10-1-399(a) and 51-12-5.1;

212.   Award the plaintiff his reasonable litigation expenses, including attorney fees, pursuant to O.C.G.A. §§ 16-9-93, 10-1-399(a), and 13-6-11; and

213.    Award such further and additional relief as is necessary to correct for

the effects of AT&T's unlawful conduct as the Court may deem just and proper

under the circumstances.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the plaintiff

demands a trial by jury on all issues so triable.

Dated: September 9, 2025          Respectfully submitted,

*/s/ Michael A. Caplan*
Michael A. Caplan
Georgia Bar No. 601039
Cameron Roberts
Georgia Bar No. 599839
**CAPLAN COBB LLC**
75 Fourteenth Street NE, Suite 2700
Atlanta, Georgia 30309
Telephone: (404) 596-5600
Fax: (404) 596-5604
mcaplan@caplancobb.com
croberts@caplancobb.com

Peter C. Canfield
Georgia Bar No. 107748
**CANFIELD LAW LLC**
34 Inman Circle NE
Atlanta, Georgia 30309
Telephone (678) 296-5413
pccanfield@gmail.com

Steve W. Berman (*pro hac vice forthcoming*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000

72

Seattle, Washington 98101
Telephone: (206) 623-7292
Fax: (206) 623-0594
steve@hbsslaw.com

Abbye R. K. Ognibene (*pro hac vice forthcoming*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
One Faneuil Hall Square, 5th Floor
Boston, Massachusetts 02109
Telephone: (617) 482-3700
Fax: (617) 482-3003
abbyeo@hbsslaw.com

Daniel J. Kurowski (*pro hac vice forthcoming*)
Whitney K. Siehl (*pro hac vice forthcoming*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
455 North Cityfront Plaza Drive, Suite 2410
Chicago, Illinois 60611
Telephone: (708) 628-4949
Fax: (708) 628-4950
dank@hbsslaw.com
whitneys@hbsslaw.com